Next case is Marina Borawick v. City of Los Angeles Good morning. May it please the Court, my name is Katherine Sweetser and I'm appearing for Plaintiff Appellate Marina Borawick. During the traffic stop in 2016 that's at issue in this case, Ms. Borawick told the officers immediately after being stopped that she was on her way to an orthopedic clinic for a badly damaged shoulder and that she was in excruciating pain. She told the officers that she needed to make her doctor's appointment, which was in less than 10 minutes. The officers insisted on her getting out of the car and handcuffing her painfully behind her back while she, in their words, squirmed and cried out in pain. She was pleading with them not to twist her arms. She said repeatedly to both officers, I have a frozen shoulder. Ms. Borawick then informed the officers that she also had multiple bypasses and that she could not have her arms in this position or she might die or go to the hospital. She pointed them to her doctor's information, which was in the front of her wallet. The officers did in fact obtain her wallet from the car and they looked inside the wallet, but they did not credit her statements. Were they required to? They were by the clearly established law in the circuit. Since 1988 in Palmer v. Sanderson, where a 67 year old man was stopped by the officers and complained of pain and was kept in tight handcuffs unnecessarily. It's been the rule in the circuit that a compliant arrestee cannot be painfully handcuffed and held in a painful position. It's also the law under Meredith v. Arath, where again a plaintiff was held for 30 minutes of tight and painful handcuffing despite her complaints of pain. And in Lalonde, the detainee surrendered and yet was painfully handcuffed for 30 minutes. Now Ms. Borawick in this case was held for a total of 50 minutes between the two transports, over 50 minutes, and she was suffering white hot blinding pain and serious injury as her bypass then became occluded and obstructed with clots. She told the officers she could not see. She pleaded with them to take her somewhere where she could get help, and yet they didn't seek any medical attention. They didn't call her doctor. They didn't call for an ambulance, and in fact when a second set of officers arrived, who are also at issue of this case, they told the second set of officers it's not even that serious, but because she was complaining they were going to transport her to the station. Let me back up if I may for a second. You also have sued the officers Calderon and Gonzalez. Are you still persisting in claiming that they are part of this liability mix, or perhaps you might withdraw the claims against them? Because it doesn't seem to me that they really had much to do with anything here. And from my reading of the law, I think the standard is that they have to be integral participants in the underlying situation. I just wonder whether you still want us to consider whether you have a viable claim against them, or whether perhaps you want to separate the wheat from the chaff and focus on your real, real good case. We are still maintaining our claim against Gonzalez and Calderon, and our evidence comes around, our strongest evidence to keep them in comes around at Exhibit 1, around minute four, about 1430 to 1530, where they arrive. They're told by the officers, you know, it's not that serious. We're taking her in because she's complaining. And then they hear her in pain about her shoulder from the car. And it's our contention that it would have been very easy for those two officers to check on her. So here's my take. You know, I also have the pleasure of serving as a district court judge. We have to process these cases many times to see which cases are worthy for trial or not. But it seems that when you allege these allegations against Calderon and Gonzalez, you may be undermining or undercutting, you know, what I consider to be more serious claims against the other officers. I just want to inquire whether you really want us to consider those claims against them or whether or not it might be more provident for you to withdraw your claims against them. While we haven't withdrawn our claims, I agree with your honor that our strongest case is against Reyes and Correa, but we're not withdrawing those claims. We do think that under U.S. versus Kuhn and Boyd, that there is a claim against those officers. I just want to get your position straight. There were four easy accommodations that the officers could have granted Ms. Borowick on that evening. And first, they could have simply not handcuffed her at all. She was a compliant woman who posed no danger to them. As you can see at ER 90, they didn't even pat down Ms. Borowick that night because they didn't consider her dangerous. They didn't call for backup. They didn't do anything that would indicate that Ms. Borowick was dangerous at all. What level of medical knowledge should we ascribe to the police officers? Because I'll confess, I actually never heard of the ailment called frozen shoulder before this case. I mean, is it possible that police officers mistakenly but reasonably thought that Ms. Borowick wasn't in that extreme pain because they weren't aware of what a frozen shoulder was and she looked able-bodied? No, I don't think the officers need to have any medical knowledge. I think from the circumstances, she described her injury to Officer Reyes first as a badly damaged shoulder. And you don't need to have any medical knowledge to think in your mind, okay, a badly damaged shoulder, then that's a shoulder, that's a serious shoulder injury. She's telling them that her arm won't go that way. And she's screaming out in pain the moment that they put their hands on her and they force her arm behind her back. And so they could have easily credited her statement that she had a shoulder injury once she told them repeatedly she had a frozen shoulder, she had a badly damaged shoulder, that it was hurting her. If the officers, here maybe the officers own words undermine their case, but if the officers didn't believe her claim of pain, would it would have been okay for them to still handcuff her behind her back? No, because in Palmer and Meredith and Lalonde, there wasn't any independent corroborating evidence. There wasn't anything else that needed to happen besides the complaint of pain for the officers to at least make some effort to check on the handcuffs, to accommodate the plaintiff in some way. And here there's several easily available accommodations, and they also could have called her doctor. She gave them her doctor's phone number and at ER 171, you'll see the doctor testified he was available. And they went to the station, Officer Reyes says in the video Exhibit 3, that he googled the condition frozen shoulder at the station, and yet that didn't change his position on the fact that she should still have her arms behind her back. There's no authority that an officer should just be free to ignore any requests for accommodation, free to ignore any complaint of pain. That's not what the case law shows. And if you'll see in Winter Rowd, there was a claim of shoulder injury, and the court found that in fact that was an abusive application of handcuffs, that it was done with malice, when after hearing about the shoulder injury, the officers ignored it and then continued to handcuff the arrestee. Returning to the different accommodations officers could have done, they could have also, if they didn't want to leave her completely unhandcuffed, they could have handcuffed her in the front, which she called for herself during the arrest. They could have called a caged car, which the officers testified at their depositions was available to them at the time. And with a caged car, there wouldn't have been any concern at all about Ms. Borwick, not that I believe that they had any, but even if they did have a concern about her being dangerous to them, they could have called for a caged car so that she could have been transported without handcuffs. They also said to her on the scene that they weren't in any hurry to get out of there, so they held her at the scene for about 15 minutes before even beginning the car ride to the station. So defendants make a lot of the fact that the car ride to the station was only five minutes long, but in fact Ms. Borwick was being held for around 25 minutes at that first transport because they just kept her at the scene and they told her we're not in any hurry to get out of here, even when she was telling them she wanted to be taken somewhere to get help. Ms. Borwick complied with all of the officers orders until they approached her to handcuff her. It wasn't until the firm grip was placed on her that she, in their words, began squirming at all. She got her license and registration out for them, she answered all of their questions. And under the ADA jurisprudence, there's no additional requirement for deliberate indifference, so defendants aren't contesting that the district court erred in finding that qualified immunity applied to the ADA. And under Sheehan at the Supreme Court, it's clear that qualified immunity doesn't apply to the ADA. Defendants aren't contesting that, they simply say that a deliberate indifference standard should be applied at the city level rather than at the officer level. But under Duval, the ADA is clearly a respondee at superior standard, it's not a deliberate indifference standard. So there's no additional  And then quickly regarding Monell, there's a clear customer practice here that the officers testified to in their depositions. So at ER 110, Correa testifies that it was always his customer practice and it was everyone's customer practice to handcuff people in these circumstances. He even mentions a person in a full body cast that he tried to handcuff. But there's a lot in the case that shows that there were circumstances in the past where the people, if somebody was in a wheelchair, if they had a broken arm, if they were wearing a cast, I don't see where you really have a pattern of practice here that rings the bell in the Monell. Maybe you can try to convince me otherwise. Well, there's a past case, Harris, that we've cited to where the plaintiff in that case had a stroke and couldn't move his shoulder properly, had a shoulder injury, and they nonetheless abusively handcuffed him. So you may have individual situations, but in order to satisfy Monell, you really need to show a broad pattern of practice or custom. I just don't see it here. There's also a record of nine complaints that were previously filed. That's the ER 488 and 495 in particular. There's a record of a shoulder injury. But the main, the crux of our Monell claim is that both the officers testified that they had never seen anyone not be handcuffed behind their back, no matter what, that they even tried on someone in a cast. They may have said that, but you have to say that it's a Monell claim because it's the practice of the LAPD to always handcuff somebody, regardless of what their circumstances may be. I don't see that to be the case here. We have the testimony of the training officer as well, Justin Wade. He's the training officer of the LAPD on handcuffing. And he testified that they never trained them to accommodate disabilities in handcuffing, that instead they would, the only example they gave them was if there was an amputee, so you physically couldn't handcuff them, that then there would be a way to handcuff. But there was never any training of the officers to not handcuff in these circumstances. Well, a briefing was underway in this case. The Supreme Court decided to enter the picture in his decision. And you had an opportunity to speak to that in your reply brief with regard to your retaliatory arrest claim. But I have to confess, I don't understand how the distinction you draw in the reply brief really speaks to the Supreme Court's point. You basically seem to argue that, well, we have more evidence of retaliation than they had in the case from Alaska. But that's not what the Supreme Court based its decision on. It based its decision on the fact that there was probable cause for arrest. And that's enough. And the one exception they carved out was if that happened to be for something for which people don't actually get arrested. And I don't see this case fitting into that exception. So is there any other basis for us to disregard or distinguish the Supreme Court's decision? Well, that case was rendered after this episode. And at the time this happened, the standard was a but-for standards. I understand it. Well, am I missing something? No, that's correct. And so plaintiffs didn't have a chance to develop a pattern of complaints. But this is also a retaliatory use-of-force case. So it's clear from the statements of the officers that they were applying the handcuffs to Ms. Borowick, holding her for so long. Under the Supreme Court's decision, if there was probable cause for arrest, and there was because there was an outstanding warrant, how is there still a claim to survive? I think under Palmer, Meredith, and Lalonde, again— None of which can trump the Supreme Court's decision. So I'm not saying all of your claim is gone, but I really don't understand how the retaliatory arrest claim can survive. Well, the probable cause may cover the arrest, but it does not cover painful handcuffing. It doesn't cover abusiveness. It doesn't cover malice. It doesn't cover any of the manner of the arrest. And so while they may have had a warrant to take Ms. Borowick into custody, it was—and officers repeatedly said it was a discretionary handcuffing. They didn't have to handcuff her on a misdemeanor warrant. You can complain about the handcuffing all you want. I just don't understand how an arrest claim based on retaliation can persist, and nothing you've said has suggested to me there is a viable distinction from the Supreme Court's decision. There's something else I want to hear, but I didn't find anything viable in the reply brief, and I haven't heard one this morning. I think the crux of our claim is really that there's a use of force here that there wasn't any use, and so it falls outside that standard. I'll reserve a minute for rebuttal. Thank you. Great. You could have a couple minutes. Great. Thank you. Good morning, Your Honors. Jonathan Eisenman for the City of Los Angeles. I think the most useful way to look at this case is to try to pinpoint what facts turn a supposedly constitutional case out of an ordinary arrest on a hit-and-run warrant. I think turning to the Fourth Amendment first, the officer's state of mind is totally irrelevant. You said that this arrest was pursuant to a warrant. That's correct. Isn't there a factual issue about whether at the time that she was arrested, whether they had knowledge that there was a warrant? I mean, it seems to me what happened here, it started as a fairly innocuous situation. Obviously, words were exchanged. This woman was not a happy camper, obviously. But she was arrested because of the tail light. Not arrested. She was stopped because of the broken tail light, right? And then something happened thereafter, where after the license was obtained and her registration, obviously, the other officer ran the check on her and found out about the warrant. But that's not the reason why she was stopped initially. So how can you say she's arrested pursuant to a lawful warrant? It's not the reason why she was stopped initially. That's correct. But the officers were aware when they pulled her over that the registered owner of that car, Marina Borowick, had a warrant for arrest. I think there's a factual issue as to whether there was knowledge of the warrant at the time that the officer arrested her. Where do you show that he actually had knowledge that there was an existing warrant at the time they put her under arrest? The officer testified that while they were, both officers testified, and their declarations are in Borowick, when she pulled in front of them, they ran the license plate on the car when they saw that the tail light was out. What came back to them on their computer in the car was there's a warrant for Marina Borowick, the owner of this car. When Officer Reyes saw her driver's license, that in fact, this was Marina Borowick, at that point, he decided to make the arrest. I don't think that the facts are in dispute in terms of... Well, he was disputed to me, I'll tell you quite candidly. He pulled her over because of the tail light. He said that. That was what it was all about. And then finally, he had a light from the car. He apparently didn't like the way she was talking to him. And at that time, when she was put under arrest, there's nothing mentioned about the warrant at that time. I think that's a factual issue. Your Honor, he doesn't say anything to her about the warrant. I don't think there's any evidence that could put in dispute that he knew about it. The contention that the plaintiff had... When did he know about it? I don't understand that. The officer, Officer Reyes and Officer Correa, as they were driving... Are you telling me that at the time that Correa went over to her and told her to get out of the car, he knew there was a warrant that he was going to arrest her because of that? At the time that Officer Reyes said, get out of the car, yes, he knew there was a warrant. He knew there was a warrant for Marina Borowick based on them having run the license plate and had returned on their computer before he got out of the car. But wasn't the deposition testimony to the contrary? No. And this is, I think, a critical point. The testimony that the plaintiffs are relying on to say, oh, wait, there's a disputed fact here. If you read it, what Officer Reyes says is, and it was in his internal affairs interview, he says he saw the license, and then there's a pause, the way that the sentence breaks, the clause breaks. And he says, my partner had run the license already. So the way that plaintiffs are reading that, contrary to both officers' testimony, and frankly, contrary to records that the plaintiff has that show timestamps on when these searches were run, they're reading that to say, well, wait a minute, it's not clear that he knew, that Officer Reyes knew at the time. Are you telling me she was stopped because they knew there was a warrant for her arrest? No, Judge Block. And not because she had a broken taillight? I'm not telling you that. I'm saying she was stopped because she had a broken taillight. But they knew at the time that they stopped her for the broken taillight, that Marina Borowick, the registered owner of that car, had a warrant for her arrest. When she showed them her driver's license, they then knew that they were dealing with Marina Borowick. It just seems that these things are factual matters that really should not be resolved on a summary judgment basis. And you have the video also, which doesn't seem to cut in your favor either. On that point, I'm not sure that the video cuts against us at all. It doesn't reflect any communication between the officers that would show that this was something learned after the fact. That's wise for a jury to sort all this out. But, Your Honor, to send this to the jury is to say that it's a reasonable assumption on this record that they happened to get lucky that this person had an arrest warrant. Reasonable assumptions are the predicate for summary judgment determinations. To get past summary judgment, there must be facts sufficient to support a reasonable inference. And respectfully, it's not reasonable to assume that the officers just happened to get lucky, particularly when you have a record showing things like a time stamp reference from their computer as to when they made these inquiries about the license plate on the car. So in any event, do you think qualified immunity attaches here? Yes. I mean, I think it's hard to dispute that. If you look at the cases on which plaintiffs rely to say that this right is clearly established, they say things like abusive application of handcuffs can violate the Fourth Amendment. That's tautological. So tell me about the Winter Road case. That's a Ninth Circuit case back in 2007. And I made these notes. Here's what the court quoted. This was an excessive force claim. The court held, quote, when no immediate threat is posed and the police can use other means of restraining a suspect, they may not insist on doing so in a manner that will cause the suspect pain. It seems to me that that's the applicable legal standard. And don't you think that we have to flush out the facts here? Let me go further. Winter Road, the police jerked the suspect's injured arm during a pat down. They were investigating a nonviolent misdemeanor traffic offense like they were doing here. And they had no evidence that the suspect was a threat and that other means of restraining the suspect. Is there any evidence that this woman was a threat to the police? I'm not sure there's evidence that she was a threat, but the relevant legal standards. Would you claim that she was? I don't think we've claimed that she was a threat. So she was not a threat. I don't think we've made a claim either way on that. I think officers are entitled to assume that you can't have an unsecured arrestee in the back of your car with you. Handcuffing arrestees is an ordinary minimal use of force. The Supreme Court has said it's normally not a violent situation. It started off as a traffic infraction here. You had some warrant which was not related to any act of violence. I mean, it seems that this is squarely within the aim of the Winter Road standard. Well, I think if we're going to discuss Winter Road as supposedly the case that sets the clear law here, for one, it's not even a handcuffing. What is the clear law? I don't think it's established, Your Honor, that if you're looking at specific... But we disregard Winter Road. That's not the law. I'm not suggesting that you disregard it. I'm just saying it does not clearly establish anything to do with handcuffing. For starters, it's not a handcuffing case. There was a pat down in Winter Road, and the Court said, hey, if you're patting someone down, there's no occasion to use force on him at all. Handcuffing is a minimal use of force that's ordinarily attendant to an arrest. That's clear both in this Court's case law and in the U.S. Supreme Court's case law. So I don't think you can say that in a case where there may be no even reason to use minimal force. You've now established the law clearly in a case where you have an arrestee who you're going to transport in a cageless car for five minutes. Now these officers should know, you know, it's completely outside the range of reasonable assumptions. Any officer would know it's outside the range of reasonable assumptions to handcuff that person. I just don't think you can say that on this record. So qualified immunity, I think, is... It should be... This is squarely within the realm of things that should be protected by qualified immunity on the Fourth Amendment side. I'd like to speak, if I might, as well to the ADA claim that's at issue here. I'd understood the plaintiffs to be dismissing that claim as against the officers individually. I see now that they're still relying on the facts as the individual officers to try and assert vicarious liability against the city. That still requires a showing of the officers' deliberate indifference. And I think under either the standard in Duval, which is the case that sets forth deliberate indifference as the standard under the ADA, or this Court's standard in Castro, you just don't have it with these officers. The Duval standard required the knowledge that the harm is substantially likely plus a failure to act. I'm not sure that you can say that the officers knew a harm to Ms. Borwick was substantially likely under these facts. If you look at the Castro standard, there still has to be a... Let me make sure I say this correctly. Officer under the circumstances would have appreciated a high degree of risk involved and still done what he did. I don't think you could say that is true here either. So I'm not sure that you can get to ADA liability against the city. Are you claiming that deliberate indifference is a predicate for ADA liability? Is that your position? In this case, I am. And it's not my position. It's what this Court said in Duval. To have ADA liability, financial liability, you have to show deliberate indifference on the part of the actors. And I don't think there's been any showing, no evidence here that the officers were deliberately indifferent. It's certainly a higher standard to meet than to say that they were unreasonable. And frankly, I'm not sure that you can say that their conduct fell outside the range of reasonable options that were available to them at the time they were making these decisions. Recognizing... And Winter Raud says that the officers do not have to credit a suspect's statement of injury. So you have here a suspect saying things like, I have a frozen shoulder, saying you shouldn't... Don't handcuff me. I'm a lawyer in good standing. That's a claim of privilege. You have a video where she's screaming in abject pain. I mean, this is not an empty record here of people just making wild assertions here. There's an awful lot of information factually that a finder of facts can credit her testimony. She had this medical information. She stopped immediately and said she's going to a hospital, please. I'm late for my appointment. I mean, it just seems to me that this is a matter which is a perfect case for a jury to ascertain what the facts were that undermine your claim. I think the thing here, Your Honor, is even if you credit all the facts in her favor, the question of then whether the force was reasonable is a legal question. And to show that it's unreasonable, it has to be outside the range of reasonable options available to these officers. So even if you assume that, okay, they think to themselves, well, wait, this person's screaming. Maybe it's not malingering. Maybe she's actually injured. They also then know it's five minutes to the station. True that they were on the scene for 12 minutes, but they left a minute after the other officer showed up to watch her car. And as you recognize, Your Honor, that's, there's nothing to bring the other officers into this. They literally, they showed up, they're there for a minute. These officers then take Ms. Borwick to jail. They book her in. She's taken out of the handcuffs. When they then move her to Santa Monica, they give her one of the accommodations she requested. Are you claiming that handcuffing is always legal and you get qualified immunity automatically when you have a handcuffing situation? Is that what your claim is? I think it's two separate questions. Let me pick it apart. I will not say that handcuffing is always permitted. It's a use of force, but it's a minimal one. And it's one that's ordinarily expected in arrests. That's something that this court has recognized and the U.S. Supreme Court has recognized. So you totally think Winterwood is an irrelevancy here. It seems to me that that really points us to asking what kind of arrest was this? What were the circumstances underlying this whole dynamic? And I think that's a jury issue. I think it's one thing to say it's an irrelevancy. I wouldn't say that. But for qualified immunity's sake, the Supreme Court has admonished this court particularly time and time again. You need specifics. Remember, what you're trying to show is that no reasonable officer in this context would have thought that their conduct was constitutional. And to say a case where officers... That's a broad reach. I think we have to be a little bit more specific than that. Your claim basically is it's A-OK to handcuff this woman regardless of the fact that she was in abject pain, regardless of the fact that she told them immediately she was going to a doctor's appointment. She had all sorts of other evidence that would support her claim. And you're telling me we should disregard all of that completely because it's perfectly OK for any police officer to take the handcuffs and put them on somebody regardless of the circumstances. Is that your position? I don't think I'm saying anything is perfectly OK, Your Honor. I'm saying that the law entitles officers to immunity in these circumstances. They make reasonable mistakes. And I don't it's clear that what they were doing here was somehow outside the bounds of reasonability. Don't the officer's own words undermine their case or at least create a factual issue? So for example, if the officer, again, reasonably but mistakenly thought that she was exaggerating her pain and that this was kind of a trick, perhaps it would be more reasonable to handcuff her. But in talking with her in the tapes, they say, you know, I have no doubt to question integrity. We just do it because it's possible some people may try to use that to take advantage of us. So don't the words here, the officer's own words, at least create a potential factual issue of whether this was reasonable? They might, except for the fact that at least as a Fourth Amendment is concerned, this should be a totally objective inquiry. So if the officer says whatever the officer says, you have to ask under the circumstances what could what could a reasonable officer have done? Maybe it's, you know, he thinks she's not malingering. Maybe he only said he thinks she's not malingering. I'm not sure that it matters. Again, given the circumstances he was presented, it's within the range of reasonable things an officer could do to say, we'll leave this person handcuffed for a short period of time. It's not a long time. We'll take her out of the handcuffs. We'll give her the extra accommodation that she wants. When we get to the station, which is what they did, I think very briefly on a qualified immunity point as well, since we're speaking of Winterbrook, you know, there's another case we mentioned on page 59 of our brief that's sharp for the proposition that you really need if you don't have clear authority on something, the officer to do something truly outlandish. But I'd point out that sharp is also a case that involves handcuffing. It happened after this. It was a case in which the officers were serving a warrant at a house. They detained the suspect's father instead of the suspect. They put him in handcuffs and they tore his rotator cuff in the process and kept him in the police car. And this court said on those facts, qualified immunity for the handcuffing. So it's really hard for me to see how you could have that case where there's qualified immunity and have this one where there isn't, that it's supposedly so obvious that what the officers were doing here was unconstitutional, that they should be held liable for it. I just don't think we get there on these facts. And I think just very quickly, in the next 30 seconds, as Judge Clifton said, just to make sure I tie this up, that I think the Nieves case here bars any First Amendment liability. If you were going to try to show it, the relevant comparator would be to say, okay, how many times do officers encounter someone for whom they have an arrest warrant and not make an arrest? I think if there is any evidence to be developed on that at all, the answer is going to prove to be close to nothing. In California, the form of a warrant is set forth in Penal Code 814, and it is a command from the court to any peace officer of the state to arrest this person if they encounter them. It's not something about which they at least should be exercising their discretion to make an arrest when they encounter someone with a warrant. So thank the court very much for its time. Thank you. This case shows officers that are clearly deliberately indifferent. They say, I'm not in a hurry to get out of here. They say, I don't care if you're in excruciating pain. They say, she says explicitly, take me somewhere to get help. And then if you look at Exhibit 3, the second transport, she reiterates for about 12 to 15 minutes. She's talking about how much pain she's in, how uncomfortable she is. She's asking for additional links. And they again just ignore her concerns. And they never take her to anywhere to get help. She says, I thought we were going to a medical dispensary. And they say, well, maybe they'll deal with that at Santa Monica. We're not going to do anything for you. So in terms of the deliberate indifference standard under Duval, I think the officers have more than met it. It's a much more egregious conduct than what happened in Duval, which was a simple denial of text. Regarding the Monell claim, the district court dismissed this claim on qualified immunity, which was clearly erroneous under Daugherty. So the jury should have had a chance to look at our evidence on Monell, and then to look at defendant's evidence, and to make a decision themselves as to whether or not there was a custom and practice here. There's sufficient evidence for this claim to go to the jury. What happened in this case is that Ms. Borowick was put at risk of her life, and in a minor traffic stop. Is there any evidence of that? I mean, she said it at some point, but what I've reviewed in the record, I really don't see anything about the outcome. It's in the sealed, her medical records are in the sealed ER, Volume 4. And if you look, there's testimony from Ms. Borowick at her deposition about her doctor's examination of her graft after the incident, about the symptoms she was suffering after the incident, including dizziness, a heavy arm. And when they did, in fact, look inside her graft, they found that there were numerous clots there, which even the defendant's expert agreed was life-threatening. We also have in the record the report of Dr. Moore, her doctor, and his declaration, in which he said both that he would have been available to take the officer's call, and that he had instructed her never to place her arms behind back because it would cause a life-threatening condition. So, in conclusion, plaintiffs should not be placed in life-threatening situations, simply because they have a traffic warrant out, or they're involved in a minor traffic stop. Ms. Borowick was a compliant arrestee, and she was subjected to not only painful handcuffing after she said she had a badly damaged shoulder, but also to a life-threatening position that she should never have been placed in.
judges: Clifton, Block, Lee